Good morning, Your Honors. My name is Mark Williams and I represent Gochner. May it please the Court. I'd like to give a little outline of how I want to proceed this morning. First, I think it's important to give an overview of the proceedings in the District Court because there's been some mischaracterizations of that that I think are important. In the briefing, we didn't have a chance to respond to the last brief. Then I'll address the issues raised in Gochner's appeal, and I'll reserve the balance of my time, hopefully around 10 minutes, to address Townsend Farms' appeal. So that's how I plan to proceed, if that's okay. That's fine. Thank you. So in terms of the overview, I'm sure Your Honors know that this case arises out of a Hepatitis A outbreak that was linked to Townsend Farms' frozen fruit blend product. And the evidence at the trial showed that there were many potential sources of contamination that caused the outbreak. For example, as District Court Judge Carter stated in his findings of fact in this case, the genotype evidence pointed to multiple sources for the outbreak. The evidence of the trial also showed that Gochner's pomegranate arils, that they were only used in some of the implicated lots that were recalled of the Townsend Farms product, and that other lots included pomegranate arils from a different company from Turkey called Sanex. There was undisputed evidence that Sanex processed its pomegranate arils using hands rather than a machine, and that this increased the risk of contamination, whereas Gochner had a machine called a Geron machine that manufactured the product without hands and was supposed to be safer. Well, since you have limited time, let me just start asking you some questions here regarding the false advertising claim. I'm just trying to figure out how is this commercial speech, if it doesn't propose a commercial transaction. It seems our law is pretty clear on that point. I don't think it has to propose a commercial transaction if you look at Bulger. I think we're in a sophisticated era of advertising. Anything can be advertising. The question is whether this was commercial, and it doesn't have to be. Your view is that, and let's assume for purposes of my question that this is what happened, that sending out a press release that corresponds with what the FDA has announced is commercial speech. It is if you include commercial aspects with it that don't need to be in there. So all you can do is send out the exact press release. You can send out whatever you want, but if you're going to make false statements, then you can be liable for false advertising. What false statement is there in this press release? The false statement was that there was a clear association between Gochner's product and the outbreak, when there wasn't a clear association. Well, the jury seems to have found there was a clear association. I don't know that they found that. They found that some 20 percent or some percentage of their loss was caused by your client's tainted arrows. Is that what you say? Yes. Well, I don't think that it's going to be false when the next day it was corroborated by the FDA. Well, that was our core theory in our cross-complaint, that we never had an opportunity. Isn't your core theory foreclosed by the jury verdict? Your core theory is there was nothing wrong with my arrows. It didn't cause your problem. And the jury says 20 percent or so of your claimed losses are attributable to bad arrows from your client. So how can you now make a false advertising? Our core theory is that the statements in the press release that said it was Gochner is not true because – You had some – there were other people who were guilty, too. You were one of five who were guilty. So is that – how is that false advertising? Well, it's not true. It's not true to say that Gochner – It is true. To say that Gochner provided rotten arrows, correct? Well, that's not what it – You don't deny that, do you? That's not what it said. Do you deny that? Well, we deny it, but I don't deny that the jury found that. Okay. So the jury found it. So how – so they should have said – and there were a bunch of other bad guys, too. Well, what they did was that they juxtaposed their products, which, by the way, there was evidence supporting the fact that Townsend Farms was the cause of the outbreak. They juxtaposed their products with Gochner's products and singled out Gochner when it was a much more complicated situation. And that damaged Gochner. That's our contention. So in your view, the FDA and the CDC also lied to the public. They got it wrong. And the reason that they got it wrong was because Townsend Farms told the FDA that there was only one pomegranate supplier. And so when the FDA did its traceback analysis, it was able to say, well, this is the common ingredient, when that was not true. Well, but the jury accepted that as true. I don't know that. I don't know that they found that the traceback analysis was true. So despite to where we are at this point, you're still claiming that that was not true. And you're trying to put it in the context of commercial speech. I don't think that there's any question that if you have a recall press release and you're talking about the recall of a product that's been contaminated, that it's certainly possible to make commercial statements that don't need to be made in that press release. And that's what we're contending happened here. By the way, don't forget, this is at the pleading stage. We never had an opportunity to try and prove what the motivations were, exactly how these statements benefited Townsend Farms, how they caused harm to Gochner. It seems from my review that Townsend received these reports from the FDA and the CDC linking hepatitis A outbreak to the lot of pomegranate arils from your client. Is that correct? That's what the CDC and the FDA determined. And at the trial, we completely undermined that, I have to say, again, pointing mainly to this other supplier, Sanix. The two witnesses who testified from the government, one was an FDA witness, another was a CDC witness, neither of them had any knowledge that Sanix was one of the suppliers. So the analysis was completely undermined. Okay. Do you want to – maybe we should ask about the punitive damages and the ability to pay. Is it your contention that your client cannot afford the $4.8 million award of punitive damages? Is that what you're arguing? To be honest, I have no idea. And the reason that I have no idea is because there's nothing in evidence that says what Gochner's financial condition is. The only evidence that we have is what kind of assets they have. Let's assume for a moment that you're right. That is a technical matter. You'll decide I didn't put enough evidence in. Do we enter a judgment in your favor or do we demand for them to cure that default? I don't have any basis for them to be able to cure that default. They had the opportunity during the trial to present the evidence to support their claim. They failed to do it. I think you have to remand with – Well, then you put in evidence that there had been a rather large investment in your company by someone. Does that at least give rise to an implication of ability to pay? No. It does not. Because you don't know anything about their liabilities and their expenses and whether they're being foreclosed on by a bank for that loan. We know nothing about those. The law could not be more clear that you can't just have assets and income. So remind me how this arose below. I assume you moved for judgment as a matter of law. So at the close of all evidence, we made a motion for judgment as a matter of law. We said, Your Honor, no evidence of financial condition. And the other side could have said at that time, Well, then, Your Honor, let us fix the record. They could have. And did not. Yeah, I don't know what the judge would have done, but they didn't do that. I don't know what the judge would have done either. But the rules would allow at that point for a party to say, I can cure the defect. Frankly, I'm not sure whether they would have, but they certainly could have tried. You're saying the rules don't allow for a remand now at this point? I don't know what would have allowed for a remand. They had their opportunity to present the evidence, and they didn't do it. I think that there's insufficient evidence of financial condition, which is a requirement. It's their burden. And that's it. The Punitive Damages Award should be struck. So in terms of the other argument on malice, oppression, and fraud, I think it's a lot more difficult of an argument for me to try and go through and talk about the lack of evidence supporting that Gochner didn't do anything with oppression, malice, or fraud. But I am going to just try to focus it a little bit there because it's an alternative ground for striking the punitive damages. And that is that this case, the only way to get punitive damages in this case was for fraud, intentional misrepresentation. And most of the case was about who was at the cause of the outbreak, not what misstatements did anyone make years before the pomegranate arils were even produced. So the jury awarded zero in compensatory damages on that claim, but somehow were able to still find clear and convincing evidence of oppression, malice, and fraud. We don't think that there was sufficient evidence for that. I do want to reserve time to respond to the Towns and Farms Appeal, but I just want to give a little preview because I think it's really important, particularly with respect to the jury instructions in this case and the verdict form, all of which invited and allowed the jury to determine what the amount of damages would be, if any, if they found Gochner to be liable. And I just want to make really clear that if you read Judge Carter's order on the post-trial motions, which is page one of the excerpts of record, Judge Carter talks at length about the fact that Towns and Farms, including Mr. Gar, who's about to argue, approved the verdict form that had the blank in it, that allowed the jury to make its determination, and that Towns and Farms used the verdict form that they're now complaining about during their rebuttal closing argument, and that they were asked after that whether they had any objection to the verdict form. And so, you know, they created the situation that resulted in this verdict, and I just want to make sure, because I haven't had a chance to respond to that in the last brief, and I'll go into it more when I come back, but thank you very much. Thank you. May it please the Court, good morning. William Gar on behalf of Towns and Farms, appellee and appellates on cross-appeal. The punitive damages issue I'm going to address. I will touch on the Lanham Act but largely rest on the briefs, and then at 10 minutes I'm going to move towards the cross-appeals so that I split my time in half, but I'll address the questions as the Court moves me forward through this process. The punitive damages issue seems to have two pieces that we need to look at, and they're really in the analysis fairly simple. When you look first at punitive damages, malice, oppression, and fraud, was there sufficient evidence there? Judge Carter got it right, and we're asking you to affirm Judge Carter's decision. Judge Carter said, if you look at what happened, there were representations by Gochner to Towns and Farms in a food safety statement. There were representations by Gochner in its food safety certifications, and remember the context in which we're in. We're selling food into the United States that's going to go into the stream of commerce. I'm a little bit more concerned about the burden of who it falls on on the ability to pay and affording the punitive damages award. So typically, I think you'll agree that it includes liabilities and expenses, not just assets and incomes, because it only gives the Court half the information it needs. So why did you not introduce any evidence of Gochner's liabilities and expenses or money owed to third parties? We actually did introduce substantial evidence associated with their ability to pay, and the burden does rest with the plaintiff. However, if you look at the Court's determinations, you've got the cases basically of Adams, Green, Bankhead. I'm more concerned pointing me to the record where you say you submitted evidence of what I just asked. And assume for a moment that ability to pay includes liabilities. I know you put in lots of evidence of their assets. Yes, and I think that it's actually if you are asking the Court to presume that the assumed liabilities, what you have to do is go back and look at what the real premise is on financial ability to pay, which is about wealth. Okay, but let's try to concentrate on the question Judge McGee asked. Did you put in any evidence at all that indicated what the liabilities they might have that offset their assets? And a good way to look at this is to go backwards from the general manager. Yes. Bear with me for a second. Did you put in any evidence? Yes, yes. Tell me what evidence it was. In fact, it came from Gochner, and I'm getting there. It's on that we tick off all of those evidence issues of wealth. It's on page 26 and page 27. No, no, no, no. I know, but I thought I looked at this, and I didn't remember seeing, you know, the evidence of liabilities, expenses, or money owed to third parties, or anything regarding that or anything that would show net figures. But if I'm wrong, this is a good opportunity and a valuable opportunity for you to show me and to tell me where I would find that. What the Court is looking for is financial statements. The Court won't find the financial statements. What Judge Carter relied on and what the case law allows us to rely on is the evidence of wealth. And the testimony from the ---- So that's a separate point. So your point is that you don't need to put in evidence. You don't need to put in evidence of liabilities as long as you put in evidence of wealth. I think that's correct because we ---- And what California case supports that? Those cases are Adams, Green, and Bankhead. What about Adams? What does Adams say? The assessment of an ability to pay for punitive damage is more art than science. And then it speaks to what you do. There is no set pattern in all these cases. Bankhead does a good job of surveying cases, and it speaks to what, in fact, is wealth. What we're looking for is to deter, not punish, deter and punish, not ---- But Adams doesn't help me because there's no evidence of the financial condition at all, correct? Adams had evidence of financial condition, but the point of Adams is it lays out the premise that, again, you don't have to have. But that's not principles. I'm trying to find a California case that says it is not necessary in an ability to pay showing for you to put in evidence about liabilities when there is evidence of wealth. I think Adams, Green, and Bankhead all say that. Well, let's talk about that because I know Adams says this whole, you know, we declined to prescribe any rigid standard for measuring the ability to pay. But in Baxter v. Peterson, the California Court of Appeals expanded that. In most cases, it says evidence of liability should accompany evidence of assets and evidence of expenses should accompany evidence of income. And so, I mean, that's what I'm looking at. And I know you're pointing to Bankhead, but it seems like Bankhead has ---- I know you're relying on Bankhead to argue that this court should assume that Gochner can pay the penal damage awards because, you know, Gochner neither argued nor introduced evidence at trial that was unable to pay. But it seems like this court has declined to use defendant's stated negative net worth to assess punitive damages award. So I'm just trying to figure out how do we measure a defendant's financial condition using, you know, just profit figures or the amounts that were submitted here and not necessarily net amounts because I'm not sure that Bankhead stands for the proposition that the jury need not rely on net worth. So Baxter repeats the premise that most cases, and that's its language, not all cases. And again, it's a court of appeals case. The Supreme Court says that there isn't a specific formula for proving wealth. And if you look at the record here, you have the general manager who is a part owner of the company getting on the stand and testifying business is good, the company is in good shape. And it's important to look at that because that is after you have a $30 million investment, you have increase in sales from $115 million to $130 million. That's a purchase of assets instead of a lease of assets. And he doesn't take the stand and say business is bad, we've got all these problems. He basically says business is good. So can they afford it? What cases tell us, at least as a matter of state law, is we have to be able to determine whether the size of a punitive damages award is excessive. And the way to do it is to look at ability to pay. So even if I assume that they had ability to pay some punitive damages award, in the absence of evidence of liabilities, how do I know this one wasn't excessive? Because when you look to the evidence that is there, the sufficient evidence that we were able to present, and the owner and general manager of the company saying business is good. Well, business is good could justify a $1 million award or a $40 million award, depending on the ability to pay of a company. So tell me how the award in this case is justified in light of the evidence. The case that is escaping me right now, what the court relied on, there was a case where the owner of the company said we're in the black. That's the same thing as saying business is good. But there is, if they were not able to. Which case is that? And I can submit that to the court at a later time. It's a case that's been cited in our briefs, and I don't have it at my fingertips right now. Is it true, or can you confirm or do you challenge that if there isn't sufficient evidence, or let's just assume just for the moment that there wasn't sufficient evidence, is it done or is there a possibility for a remand? If so, what authority do we have? It's done. There's sufficient evidence. The reasonable inferences can be drawn from what the jury decided, and so it's done. And so the punitive damages, the court did a good job of laying out. No, if we think there's not enough evidence to support the punitive damages award that was submitted here, do you get a remand or are we done here? I don't think we have a basis for a remand. I think that you have to look at this by looking at these cases and say that in fact Judge Carter got this right. So if we think he got it wrong, then we should throw out the punitive damages award and not remand for a new trial? That's up to the court, but I believe that Judge Carter got this aspect of the case correct when he cited in his order. So if net worth is the measure for punitive damages, and that seems to be what the California cases say, what evidence do we have here of net worth? Net worth is not the measure, and net worth is not what the California cases say. What we last said when we were last looking at the California cases in this court, that's what we said they said. I appreciate that, and it's you who is saying that, and me interpreting them in the cases that I'm reading is that they continue to say there isn't a bright line and financial net worth is not the full text. No, there's not a bright line. So how can I determine in this case, I'm just going back to my basic question, whether the award was excessive? By what measure do I look to see whether the reward was excessive? By measure of the testimony of the individual's wealth and their ability to pay that wealth when you talk to first the individual on the stand who is a general manager and a member who says business is good. Business is good. And he says the company is in good shape. Was the award in this case $2 million? And then the award in this was $275. So how do I tell the 27 is not excessive as compared to 13? Because like your question at the very beginning, there was a $30 million investment at the very beginning and then from that. Five years before. Five years before, but then there wasn't anything subsequent to that other than development and growth. So it wasn't five years before and then there's foreclosure in their all instances. But assuming for a moment that liabilities are an element of wealth, don't you concede that the jury did not have the opportunity to evaluate an essential element to determine net worth or wealth and ability to pay? I'm not conceding that liabilities are an element of wealth. What I'm suggesting is that the court, and we did not present liabilities, but that liabilities are not an element of wealth. They are an aspect of it and the courts have said there's no bright line and, in fact, it's more art than science. And as a result, Judge Carter found that based on the testimony as he sat there and as the jury inferred, the jury made the decision and the jury's determination should be upheld and we should affirm Judge Carter. The Lanham Act case, I'm going to rely on my briefs. I will say that if the idea of a required report on a recall event is a commercial event and that's sending out to the public marketing so that we're attempting to engage in some commercial activity, my friend, Mr. Williams, I just respectfully find that unbelievable, that that, in fact, could be considered a marketing event of some sort in commercial speech. We'll rest on our briefs on that. On our cross appeal, what I think is incredibly important for the court to understand is that, as I want to walk you through a short timeline so that while I have the seven minutes left in my time, what the individual plaintiffs, me being one of them as the lawyers, understood regarding this scenario. This court has the authority to change the judgment and modify the judgment on equitable indemnity and apply the set amount of stipulated damages that the parties all agreed to. And that comes from, as we look at this. I know we have that power. The question is why should we exercise it in this case? And that's a great question. This is a case that seemed to have been tried on the theory that there were many wrongdoers. That was their theory. You were one of them, they said. You, Townsend, was one of them. They were, the jury found they were one of them. And the other people were wrongdoers, too. So why couldn't the jury look and say, maybe you, we stipulate that you suffered $12 million in total damages from this event, but only 20% of it was the fault of these people. Because the jury was never given a comparative fault instruction. The jury was never given Casey. So what? FRCP 49 speaks to when you instruct the jury, the jury has to have some level of instruction on the jury form when they're doing some acting. It wasn't the jury's job to determine how much of your damages were caused by their wrongful actions. No, no. They were not. They were not. The jury was told in our verdict form and in the jury instructions that, in fact, if they found Gochner liable under the Actual Indemnity, that, in fact, what they were supposed to do is apply the set amount of damages in the stipulated agreement. That was what the original verdict form and the jury instructions speak to that. And if the court would give me leave to point out just a few factors to help answer that question and help form what was in the minds of the lawyers, it's incredibly important. On September 20th of 2016, there was an answer, the eighth affirmative defense, and that's at the ER 185. That affirmative defense lays out Casey 3800, which is the apportionment of damages if there is, in fact, other tortfeasors who were found liable. On February 13th, 2017, two months prior to the trial, there's a Memorandum of Contentions of Facts and Law. In that Memorandum of Contentions and Facts at SCR 16 and 17, specifically at 17, they indicate what they have to prove for comparative fault, they being the defendants. They write it out. They say that Townsend has to be found negligent. They cite to Casey 3800. So they're setting this all up for a comparative fault strategy. On March 28th, and this is extremely important, at SCR 200 through 203, and this is on 52 and 53 of our brief, March 28th, 2017, there's an email between Mr. Williams, a partner that he's working with, and my colleague who's representing the co-plaintiffs. And in that email, they specifically, they change, they are looking at an instruction number 18 that talks about comparative fault. They strike the comparative fault. They write in the margins, we are dumping the affirmative defense. There is no more reference to a jury instruction for comparative fault for 3800. The jury then, we then try this case, as the court refers to SANEX, PPI, the genotypes. That's an all or nothing defense. And what is important is if you then get the jury instruction 20, if you compare jury instruction 20 to jury instruction 18, that's at ER 381, it removes all of the comparative fault language. The jury was never instructed on comparative fault at any point in time. There's a stipulation. I mean, I think this is regarding what you're talking about. In paragraph 10 of the stipulation, you stipulate to two things, that you paid $13.7 million and that the figure was reasonable. Correct. No one stipulated that that was caused by the actions of Gochner. You are correct, but the jury found that it was caused by Gochner. The jury found, was instructed, I'm looking at jury instruction 33, it was up to their discretion, based on the plaintiff's burden of proof, to award damages that they believe the defendants caused. With respect to this defendant, they found that it caused $27, $2.7 million of damages, right? That is correct. So what is that in the analysis? I'm terribly sorry. Which instruction are you reading, Your Honor? I was reading number, I think it was 33. Let me go back to it. It's the one that Judge Carter, whom you correctly praised for his thoroughness, cites in refusing to alter and amend the judgment. We can have a good day and a bad day within our order, Your Honor. I know. So it cuts back and forth. It does. I'm well aware of that, trust me. 33 is basically damages, general damages. Right. But it doesn't say. What does it say? Read it. No, I've read it. It says if you determine what damages have been improved, your award must be based on evidence, not speculation and guesswork. So they were told to award the damages based on the, as against each defendant, based on the evidence. There were more than one defendant in this case, right? Yes? Yes. Was there a separate damage award against Valley Forge? There might have been. I don't have that information. Was that for $12 million? No. So the jury looked at the various defendants and figured out what damage they caused. Absolutely. They did a comparative fault without an instruction. God bless them. But they were told to. They were told to. This is not a joint and sever liability case, is it? No. So the jury was asked to determine what damage each defendant caused and made that determination. What's wrong with that? As to there were negligence claims. And what becomes wrong with it is that the verdict form, which was changed on us, and I want to speak to that, the verdict form that was changed on us, when you would get to equitable indemnity, you would say, here, did they prove liability, which is the all or nothing case my friend Mr. Williams tried. All or nothing. The verdict form that was changed on you, did you object to it? We did not object to it, but you cannot object to something that you don't know about. How did you not know about it? Quite easily. So the timeline associated with that, and this is all in the record, you began with oral argument. We come into Judge Carter's courtroom in the morning. We have submitted our proposed jury instruction at around 6 a.m. Judge Carter, when we arrive, announces that he's going to accept the plaintiff's jury instruction. Mr. Williams and his partner stand up, and they have some kind of objections. Judge Carter tells us he's going to have no argument on this, but he's going to give the defendant some deference. At 847, there's an e-mail that is submitted, and if you look at that e-mail, which is the revised instruction, and remember, this is why it was important that I walked you down through the timeline of starting out with affirmative, defensive, comparative, fault, and completely dropping that, and then trying this case on, it's everybody but us. It's an all or nothing. If you look at that, specifically, the red line version, which is submitted, did purely poem, proved negligence, it has a number of questions that would get you to, is the judge going to argue this? What's going on? So there's just a red line version, and the judge never points this out to us, or morning arguments go on. So is it your position that you never saw the jury form? That's exactly right. And you never asked to look at it? No, we thought we were using our own. But that's still my question. The judge didn't say I'm using yours. Let me explain again the timeline. I understand you were pressed for time. My question is a very simple one. Did you ever see the jury form before it went to the jury? No. Did you ever ask to see the jury form before it went to the jury? We didn't need to. We didn't understand that there was a change. No. No, we didn't ask to see one. You may have a great excuse. That's not what I'm asking. Did you ever ask to see the jury form before it went to the jury? We didn't ask because we had it in front of us. It was our verdict form that we had submitted. Did the judge say I'm going to submit your verdict form? The judge said at the beginning of argument that morning before closing argument. Tell me where in the record the judge said I'm going to submit the verdict form that you gave me, Townsend. The judge says in his order the parties objected to that form. They marked it up. And so it was clear there was an objection to that form. And if you read closely what the record says, the parties were objecting to minor factors associated with the judge. What Judge Carter also says is if I could get this timeline out, which is important, the judge says Townsend Farms attorney. It wasn't Townsend Farms attorney me who had been the person working on the minor details over the lunch hour. It's the Townsend Farms attorney who was up working on his closing argument without a final verdict. He says that attorney referenced the verdict. We had a copy of it. That attorney was referencing. He wouldn't have been able to reference it because we were all working on it. He was building his argument. We came back. We sat there and we started closing argument right after. So all that occurred. Yes. And then later on you found out that the verdict form that went to the jury was not the one that you expected. Yep. Did you ever go to Judge Carter and say, oh, my gosh, the jury form was wrong? Yes. Where? Sunday. Where in the record? Docket. You have a great recollection of when things occurred at the trial. Tell me where in the record the objection was made to the jury form. It started with a request to the docket number. And I apologize that it isn't in the excerpt of the records, but it's docket number 242. Good Friday is the close of arguments. Tell me what docket number 242 says. 242 is a letter from David Godwin saying, here's our concerns. It's on Easter Sunday, two days after the court has said the jury has awarded us. They found Gochner liable on everything, awarded damages, and within five minutes were dismissed. We're all sitting there trying to understand what happened. Tell me, does 242 say we object to the jury form? It says we want to raise and brief the issue so we are going to object. It doesn't use the word objects. It says it raises the issue that we're going to brief this, and that's where the briefings came from. On Sunday, as we went through the analysis of what happened by pulling from the court the posted verdict form that was signed by the jury and began to understand what was happening to us, then we wrote on Easter Sunday to the judge and asked for the briefing, and that's, in fact, what happened. And I'm three minutes over my time, and I want to respect the court. I will stand here and answer questions all day long, and I know that's not what the court wants. Thank you. Okay. Thank you very much. So can you help us out with the jury form? Tell us what happened. Yeah. So. And I don't care what holidays. The morning of closing arguments was April 13th, and the plaintiffs submitted a second amended proposed verdict form. It's in the morning, like six in the morning or so. We came in, and we objected. Judge Carter says that in his order. Yeah. This is all on page 9 and 10 of Judge Carter's order. It's all accurate and it's all on the record. That's ER 9, ER 10. Judge Carter says, don't tell me your objections. You know, I want you to put a pencil to paper. And what we did is we made a red line. We sent it to everyone. Sent it to all counsel, 845 in the morning, with our red line objections, saying, no, we need to have a blank for the jury to decide what amount of damage is, if any. Then there was a lunch break. And here's where, frankly, I'm just a little, I have to call it as it is. Mr. Garr sat at the table with my colleague Anya Goldstein and Judge Carter and Judge Carter's clerk, and they worked during the lunch break on the verdict form. And everyone approved it. And Ms. Goldstein submitted a declaration that said that. And if you look at Mr. Garr's declaration, which is in the record, Mr. Garr's declaration is SER 238. He acknowledges that he was there when all these changes were made. And the verdict form was not finalized during the plaintiff's initial closing argument, but it was finalized for the rebuttal. And as Judge Carter points out, Townsend Farms' lawyer used it extensively. And I'm quoting Judge Carter. He used the verdict form extensively in the rebuttal closing argument. Not only that, Judge Carter, after the jury retired, but before the verdict was announced, Judge Carter specifically, and this is on page 10 of his order, and it's reflected in parts of the record that are actually not included, but it's quoted in Judge Carter's order. He said, now, counsel, do you want to have a look at these again, the verdict forms, the instructions? Silence. Okay, we're off the record. They never objected. They never objected. The letter that Mr. Garr is referring to is a post-verdict request. And you agree they did object post-verdict? Post-verdict, they made motions. I don't know whether they objected. Well, a motion. They moved to. Yeah, it's too late. The jury's gone. The jury was discharged. There was no objection at that point. They could have done it right then and there as well. And I do want to point out, Judge Hurwitz, you're absolutely right, jury instruction number 33. Jury instruction number 33, which was every jury instruction in this case, jointly submitted. We all got in a room and figured out and hammered it out. And jury instruction 33 says, Damages means the amount of money that will reasonably and fairly compensate the defendant for any injury you find was caused by the defendant. So it put it to the jury, and the jury also had it put to them to decide what amount of damages, if any, in the verdict form. And what I'm trying to figure out is, are there damages awarded against other defendants in this case? No. There are not? There are not. There are not. You. Well, Gochner and United Juice, which are affiliates. The same. Yes. So if they had $12 million in damages arising from this and no damages were awarded against any other defendant, doesn't this have to be a jury finding of comparative fault on their part, on Townsend's part? I don't think so, first of all. First and foremost, because Townsend Farms submitted a jury instruction that opened this up for the jury to decide. No, I'm just. Yeah. Put aside. Implicit in this must be a finding of comparative fault, yes? It's hard to know exactly what the jury did. Well, but if there is no instruction on comparative fault, how did the jury arrive at that? The jury looked at all the evidence and it determined there were multiple causes, presumably, and there was ample evidence of that, ample evidence of causes that we don't even know, potentially, because of the different genotypes. And the jury made a determination and it decided what amount of damages, if any, Gochner was responsible for. Did you argue a percentage damages theory to the jury? No, we didn't argue a percentage. You just argued that you weren't liable. We argued we weren't liable. We argued there were multiple different sources. We argued that Sanex was liable. We argued that Townsend Farms had a participation. When does the jury arrive at this number? I don't know. But that's not. I don't think we can do that. I don't think we have to get behind and understand exactly how the jury came to its number. There's sufficient evidence to support the verdict, and that's really all that we have to decide on. According to Mr. Gar, citing, I think it's the Mullen case, Mullen v. Lumber Company, in the damages stipulation meant that both parties agreed, if I understand his argument, that liability was the sole issue at trial. What's your response to that? There was never, ever, ever any concession that causation was not in dispute. We disputed causation at every turn. We said that we didn't cause all the damage. That's not our damage. So, you know, I think that the only thing that we stipulated to, all we stipulated to, is that instead of having a bunch of lawyers come in and say how much money people settled, the lawyers settled underlying consumer claims for, that we just agreed what those numbers were. That's all we stipulated to. That's it. And so, you know, what we're talking about here on amending the jury, sorry, on amending the judgment is a pretty extraordinary remedy. And it's under an abusive discretion standard. Yeah, no, and I'm not so much concerned about the amending the judgment argument as I am with their attack on the damages award itself. In other words, should we send this back for a new trial on damage? There's no motion for a new trial. It doesn't matter if there's not sufficient evidence to support the judgment. Well, there's also no challenge to the sufficiency of the evidence. All they're doing is saying fix the judgment and give us the number that we wanted. I'm just telling you that there is sufficient evidence because of all the evidence of the different causes. Can you go back to the punitive damages award just briefly? Yeah. Let's assume that there's evidence that your company had enormous amounts of financing, billions of dollars of financing, and that was the only evidence in the record. Billions of dollars of investment from outside sources. Would that be enough to show ability to pay? You're asking me if at some point it becomes permissible to speculate if the number's that big? I'm asking you whether at some point it's permissible to infer from numbers that big ability to pay. You can call it speculate. I'll call it inference. I don't know. I don't think that we have that here. I think that what we have here is— Because that was my next question. Why don't we have that here? We don't have that here because, first of all, I want to correct. The $2.7 million was compensatory. $4.8 million was the punitives on a zero compensatory award on the intentional tort. Oh, yeah, but we're talking about the $2.7. We're talking about the $4.8. $4.8. Yeah, $4.8. We're talking about $4.8. Yeah. You're right. I conflated. All we have is evidence of a business's assets, and that's it, and income. I can't tell you. I honestly don't. One of my concerns, and that's why I was asking the question, is even assuming we could take the $20 billion investment into account, I'm not sure how that lets me conclude that $4.8 is an appropriate number. I don't think you can. That's the purpose of the requirement. There might be an appropriate number, though, based on a large investment, but couldn't— By the way, you'd want to know what the terms of that investment were. Whether it was secure or not. Yeah. That's it. Thank you very much. Thank you. Thank you both for your presentations here today. The case of House and Farms Incorporated v. United Juice Corporation, Dr. is now submitted.
judges: Murguia, Hurwitz, Guirola